1
2
3
4
5
6
7
8                           UNITED STATES DISTRICT COURT

9                           EASTERN DISTRICT OF CALIFORNIA

10

11    PETER FONG, et al.,                        No.  2:22-cv-01291-MCE-KJN

12                    Plaintiffs,

13          v.                                    **MEMORANDUM AND ORDER**

14    U.S. BANCORP, et al.,

15                    Defendants.

16
            By way of this action, Plaintiffs Peter Fong and Sut Fong (collectively, "Plaintiffs"),
17
      on behalf of themselves and others similarly situated, seek to recover for injuries
18
      sustained when valuables they stored in a safe deposit box with Defendants U.S.
19
      Bancorp ("USB") and U.S. Bank National Association ("USBNA") (collectively,
20
      "Defendants")[1] were discovered missing.  Presently before the Court is Defendants'
21
      Motion to Compel Arbitration and Dismiss, or Alternatively, Stay Proceedings (ECF No.
22
      10).  For the following reasons, that Motion is GRANTED.[2]
23

24

25

26          _____
                     [1] USBNA is a wholly owned subsidiary of USB.
27
                     [2] Because oral argument would not have been of material assistance, the Court declined to set a
28    hearing date and decides this matter on the briefs.  E.D. Local Rule 230(g).

1

2

**BACKGROUND**[3]

3    Defendants have offered California customers the use of "safe deposit boxes"

4 throughout the state for years.  The boxes are, as the name implies, intended to provide

5 a safe place for customers to store or deposit valuables.  These boxes are kept in

6 Defendants' vaults, and two sets of keys—one set kept by Defendants and one set kept

7 by the customer—are required to open the boxes.  In theory, Defendants cannot open a

8 box without a customer, and a stolen key cannot be used because Defendants identify

9 key holders prior to allowing them access to the boxes.

10    Plaintiffs are brothers and first-generation U.S. citizens.  Their ancestors

11 immigrated to the United States, and California in particular, toward the beginning of the

12 last century.  They worked on the railroads and the Golden Gate Bridge before Plaintiffs'

13 grandparents moved into restaurant work.  Eventually they started their own restaurant

14 business, which, through their hard work and grit, enjoyed some success.  Plaintiffs'

15 grandparents did not know how to invest in stocks or other securities, however.  Instead,

16 they bought jewelry and other tangible valuables as a way to save and invest their

17 money.

18    The jewelry and other items Plaintiffs acquired over time were extremely valuable.

19 Plaintiffs' grandparents taught them to be prudent and to safeguard these investments.

20 They also told Plaintiffs to always keep cash in a safe deposit box in case of an

21 emergency.  Accordingly, to safeguard their family treasures, in 2000, Plaintiffs paid for a

22 safe deposit box at one of Defendants' branches in Sacramento.

23    Plaintiffs dutifully paid the fees required to maintain the safe deposit box for over

24 twenty years, and they maintained several items of substantial monetary and sentimental

25 value in the safe deposit box including, among other things:

26       a. $85,000 in $100 bills issued in the 1980s and 1990s in
            excellent condition

27 ─────────────────────

28       [3] Unless otherwise indicated, the following facts are taken, primarily verbatim, from Plaintiffs'
    Complaint.  ECF No. 1.

b. $1,500 in $50 bills

c. $600 in $20 bills

d. A pouch of 14 individually wrapped American Eagle Gold Bullion Coins

e. Two $1,000 dollar bills from 1928 in excellent condition

f. Two very rare $500 dollar bills from 1928 in excellent condition

g. Five $20 gold certificates from 1922 in excellent condition

h. Four 10oz Gold Bars

i. One satchel containing 45 pieces of natural, excellent cut investment diamonds

j. Natural pearl necklace

k. 18K gold engraved ring with large natural jade stone

l. 14K gold diamond studded ring with 1.5K round diamond

m. Four natural green translucent jade bangle bracelets

n. 24K thick yellow gold bangle bracelet with natural jade stone

o. Four 24K thick yellow gold necklaces (2oz)

p. Four 24K thick yellow gold pendants (4oz)

q. Two 24K gold bracelets

r. 24K gold bracelet with dragon carvings

s. Pair of gold earrings with gold pendant

t. Pair of gold earrings with jade pendant

u. Two Chinese Fu Natural Jade Necklaces with 24K gold chain

v. Three 24K solid yellow gold necklaces

w. Men's Gold Rolex Watch

x. Women's Gold Rolex Watch

According to Plaintiffs, in 2013, an employee of Defendants had trouble with the bank's "guard key," taking several tries to get the key to successfully turn in the lock of Plaintiffs' safe deposit box. Pls.' Opp'n, ECF No. 15 at 2. Defendants subsequently

3

1  called Plaintiffs to advise them that the guard key for their existing box was damaged

2  and that they needed to move the box to a new location.  Id.  In November of that year,

3  Plaintiffs returned to the bank, relocated the box, and were provided a new set of keys.

4  Id.  According to Christina Anderson, a Business Banking Relationship Manager for

5  Defendants who previously served from 2011 through 2014 as a Personal Banker, there

6  was indeed a mechanical issue with Plaintiffs' original box, box number 3450, and, as

7  Plaintiffs indicate, they were reassigned box number 20038 in 2013.  Supp. Anderson

8  Decl., ECF No. 22, ¶ 2.

9      As a Personal Banker, Ms. Anderson was tasked in 2013 with, among other

10  things, opening safe deposit boxes for customers, and she explains the procedures

11  Defendants required at the time and that she purportedly followed.  Anderson Decl., ECF

12  No. 10-1, ¶ 2.  More specifically, according to Ms. Anderson, Defendants "provided

13  Personal Bankers with an Operating Procedures Manual ('Procedures Manual') that

14  provide[d] detailed instructions to follow when opening customer accounts, loans, credit

15  cards, and safe deposit boxes."  Id., ¶ 3.   Ms. Anderson avers that she "was given a

16  copy of the Procedures Manual when [she] started working [for Defendants], and

17  amended versions, as necessary."  Id.  "The Procedures Manual always included a

18  section titled 'Safe Deposit Box Opening Instructions.'"  Id., ¶ 3, Ex. A.

19      Because it was not particularly common for customers to request to open a safe

20  deposit box, whenever Ms. Anderson assisted in the process, she purportedly

21  referenced the foregoing instructions and always followed specific steps: (a) establish

22  how many individuals required access to the safe deposit box; (b) open the account in

23  USBNA's computerized database system; (c) ask the customer the preferred safety

24  deposit box size; (d) obtain two keys and ensure the functionality of both; (e) confirm the

25  physical box number corresponded to the number input into the computer system; (f)

26  print and provide documents to the customers, including the Consumer Safe Deposit

27  Box Contract ("Contract"), Your Deposit Account Agreement, Consumer Privacy Pledge,

28  and Consumer Pricing Information; (g) witness the customer sign the Contract and then

4

1   sign it on behalf of Defendants; (h) process the customer's payment and give the

2   customer the safe deposit box keys; and (i) file the executed Contract.  Id., ¶ 4.  Having

3   reviewed the Contract signed by Plaintiffs in 2013, Ms. Anderson avers that she assisted

4   them in establishing the safe deposit box at issue here, that she always followed the

5   process set forth in Defendants' instructions, and that she therefore adhered to those

6   instructions in opening the safe deposit box for Plaintiffs.  Id., ¶ 5.[4]

7         Both Plaintiffs and Ms. Anderson did indeed sign the Contract in 2013.  At the top

8   of the form, the Contract title is listed in bold.  Also at the top of the page, above the

9   sections for Plaintiffs' information and the parties' signatures, the Contract states:

> The undersigned Renter(s) hereby rent the safe deposit box
> described in this agreement.  Renter(s) agrees to the terms of
> the "Safe Deposit Lease Agreement", as amended from time
> to time (the "Rules"), including the payment of rental fees in
> advance.  Rental fees are paid annually and subject to change.
> The Rules are incorporated herein by reference and made part
> of this agreement.  **By signing, Renter(s) acknowledge**
> **receipt of two keys, a copy of the present Rules, and**
> **understand that FDIC-insurance or the Bank's insurance**
> **policy does not cover safe deposit boxes and their**
> **contents.**  If Renter wants to insure the safe deposit box
> contents, it is Renter's responsibility to obtain such insurance.

Id., ¶ 5, Ex. C (emphasis in original).

      The Your Deposit Account Agreement contains the Rules.  Id., ¶ 4(f), Ex. B.  The

Rules in turn contain an arbitration agreement with a class action waiver:

> **ARBITRATION**
>
> **This section does not apply to any dispute in which the**
> **amount in controversy is within the jurisdictional limits of,**
> **and is filed in, a small claims court.  These arbitration**
> **provisions shall survive closure of your account or**
> **termination of all business with us.  If any provision of this**
> **section is ruled invalid or unenforceable, this section shall**
> **be rendered null and void in its entirety.**
>
> **Arbitration Rules: In the event of a dispute concerning**

---

[4] Plaintiffs dispute whether they "opened" a new safe deposit box at this time because they contend they instead "moved" an existing box to a new location.  Ms. Anderson testified that the procedures she followed would have been the same regardless.  Supp. Anderson Decl., ECF No. 22, ¶ 2.  Accordingly, the semantics of how exactly Plaintiffs ended up with box number 20038 do not change the Court's analysis as it is set forth below.

your account or this Agreement, you or we may elect to arbitrate the dispute. At your election, the arbitration shall be conducted by either JAMS or the American Arbitration Association ("AAA") (or, if neither of these arbitration organizations will serve, then a comparable substitute arbitration organization agreed upon by the parties or, if the parties cannot agree, chosen by a court of competent jurisdiction.)  If JAMS is selected, the arbitration will be handled according to its Streamlined Arbitration Rules unless the claim is for $250,000 or more, in which case its Comprehensive Arbitration Rules shall apply.  If the AAA is selected, the arbitration will be handled according to its Commercial Arbitration Rules.  You may obtain rules and forms for JAMS by contacting JAMS at 1-800-352-5267 or www.jamsadr.com and for the AAA by contacting the AAA at 1-800-778-7879 or www.adr.org.  Any arbitration hearing that you attend will take place in the federal judicial district in which you reside.  Without regard to which arbitration body is selected to resolve the dispute, any disputes between you and us as to whether your claim falls within the scope of this arbitration clause shall be determined solely by the arbitrator, and not by any court.

Arbitration Process: Arbitration involves the review and resolution of the dispute by a neutral party.  The arbitrator's decision will generally be final and binding.  At your request, for claims relating to consumer accounts, we will advance the first $375 of the filing and hearing fees for any claim you file against us; the arbitrator will decide whether we or you will ultimately pay those fees. Arbitration can only decide our or your dispute and cannot consolidate or join claims of other persons who may have similar claims.  There will be no authority or right for any disputes to be arbitrated on a class action basis.

Effects of Arbitration: If either of us chooses arbitration, neither of us will have the right to litigate the dispute in court or have a jury trial.  In addition, you will not have the right to participate as a representative or member of any class of claimants, or in any other form of representative capacity that seeks monetary or other relief beyond your individual circumstances, pertaining to any dispute subject to arbitration.  There shall be no authority for any claims to be arbitrated on a class action or any other form of representative basis.  Arbitration can only decide your or our claim, and you may not consolidate or join the claims of other persons who may have similar claims, including without limitation claims for public injunctive or other equitable relief as to our other customers or members of the general public.  Any such monetary, injunctive, or other equitable relief shall be limited solely to your accounts, agreements, and transactions with us. Notwithstanding the foregoing, any question as to the validity and effect of this class action waiver shall be

1

**decided solely by a court of competent jurisdiction, and not by the arbitrator.**

2

Id., at 19–20.

3

4          For their part, Plaintiffs aver that they also "had a habit of retaining, and . . . did

5     dutifully retain, all documents that [USB] provided to [them] concerning the safe deposit

6     box."  Peter Fong Decl., ECF No. 17, ¶ 9.  According to Plaintiffs, they were never

7     provided with an arbitration agreement, nor did they discuss arbitration with any of

8     Defendants' employees at any time.  Id., ¶ 11.  To confirm this, Plaintiffs searched their

9     files and were unable to locate any documents containing an arbitration provision.  Id., ¶
12.

10

11          In any event, years later, in November 2021, Plaintiffs learned that Defendants

12    had "drilled"[5] into their safe deposit box without their knowledge or consent.  Id., ¶ 23.  In

13    fact, according to Plaintiffs, they only learned that their safe deposit box had been

14    breached because they were notified by a law enforcement officer, who conveyed that

15    he had seen numerous other drilled boxes as well.  Id., ¶¶ 23–24.  Plaintiffs rushed to

16    the bank branch.  Id., ¶ 25.  When they arrived, "a Bank employee dumped the contents

17    of the box onto the table.  While some of the cash and certain jewelry were there, other

18    family heirlooms were missing; envelopes and silk pouches that once housed the
valuables, empty."  Id., ¶ 26.

19

20          Plaintiffs demanded that Defendants provide their missing property, but

21    Defendants did not or could not.  Id., ¶ 27.  Nor would Defendants provide an

22    explanation for the missing valuables.  Id.  Plaintiffs thus spoke with Defendants' District

23    Manager and "learned that the bank had conducted an internal investigation into the

24    matter, including a review of internal security camera footage, but the bank refused to

25    disclose any specifics, or even permit [Plaintiffs] to review the security camera footage."

26    Id., ¶ 28.  According to Plaintiffs, they were then told to hire a lawyer.  Id.  In response,

27    Plaintiffs "sought the assistance of the Sacramento Police Department, the FBI, and the

28
_____
          [5] "Drilling" refers to the manual opening of a safe deposit box without use of the appropriate keys and, at least in this case, without the customers present.

Comptroller of the Currency, but they would not intervene." Id., ¶ 29.  Plaintiffs eventually reached out to the Consumer Finance Protection Bureau ("CFPB").  Id., ¶ 30.  The CFPB opened a case, and Defendants provided a written response to Plaintiffs with a copy to the CFPB advising that they had conducted their own investigation from which they concluded no bank error had occurred.  Id., Ex. 2.  In that letter, Defendants stated, in part:

> Should you wish to request a copy of any available video surveillance, you may do so with a court issued subpoena in writing to:
>
> U.S. Bank Attn:
> Customer Care Unit
> PO Box 64991
> Saint Paul, MN 55164

Given this response, Plaintiffs contacted counsel and initiated this action seeking to recover under theories of:  (1) strict liability; (2) conversion; (3) trespass to chattels; (4) negligence per se; (5) negligence; (6) promissory estoppel; (7) intentional infliction of emotional distress; (8) unjust enrichment; and (9) unfair business practices in violation of California's Unfair Competition Law, California Business and Professions Code §§ 17200 et seq.  The only question currently before the Court is whether Plaintiffs should be compelled to arbitrate.

**STANDARD**

The Federal Arbitration Act ("FAA") provides that "[a] written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2.  Under the FAA, a party may seek a court order compelling arbitration where another party refuses to arbitrate.  Id. § 4.  Valid arbitration agreements must be "rigorously enforced."  Perry v. Thomas, 482 U.S. 483, 490 (1987).  To that end,

8

1   the FAA "leaves no place for the exercise of discretion by a district court, but instead

2   mandates that district courts <u>shall</u> direct the parties to proceed to arbitration on issues as

3   to which an arbitration agreement has been signed." <u>Dean Witter Reynolds, Inc. v. Byrd</u>,

4   470 U.S. 213, 218 (1985) (emphasis in original).

5           "Section 2 [of the FAA] is a congressional declaration of a liberal federal policy

6   favoring arbitration agreements, notwithstanding any state or substantive or procedural

7   policies to the contrary." <u>Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp.</u>,

8   460 U.S. 1, 24 (1983). However, "the FAA's 'policy favoring arbitration' does not

9   authorize federal courts to invent special, arbitration-preferring procedural rules."

10  <u>Morgan v. Sundance, Inc.</u>, 142 S. Ct. 1708, 1713 (2022) (citing <u>Moses H. Cone</u>,

11  460 U.S. at 24). This policy "is merely an acknowledgement of the FAA's commitment to

12  overrule the judiciary's longstanding refusal to enforce agreements to arbitrate and to

13  place such agreements upon the same footing as other contracts." <u>Granite Rock Co. v.

14  Int'l Broth. of Teamsters</u>, 561 U.S. 287, 302 (2010) (citation and internal quotation marks

15  omitted). In other words, "[t]he policy is to make arbitration agreements as enforceable

16  as other contracts, but not more so." <u>Morgan</u>, 142 S. Ct. at 1713 (citation and internal

17  quotation marks omitted); <u>see also</u> <u>Gilmer v. Interstate/Johnson Lane Corp.</u>, 500 U.S.

18  20, 24–25 (1991) (stating that the FAA's purpose was . . . to place arbitration

19  agreements upon the same footing as other contracts," and recognizing a "liberal federal

20  policy favoring arbitration agreements"). "[A] court must hold a party to its arbitration

21  contract just as the court would to any other kind. But a court may not devise novel rules

22  to favor arbitration over litigation." <u>Morgan</u>, 142 S. Ct. at 1713.

23          Generally, in deciding whether a dispute is subject to an arbitration agreement, a

24  court must answer two questions: (1) "whether a valid agreement to arbitrate exists,"

25  and, if so, (2) "whether the agreement encompasses the dispute at issue." <u>Chiron

26  Corp. v. Ortho Diagnostic Sys., Inc.</u>, 207 F.3d 1126, 1130 (9th Cir. 2000). If a party

27  seeking arbitration establishes these two factors, the court must compel arbitration.

28  9 U.S.C. § 4; <u>Chiron</u>, 207 F.3d at 1130. Accordingly, the Court's role "is strictly limited to

1    determining arbitrability and enforcing agreements to arbitrate, leaving the merits of the

2    claim and any defenses to the arbitrator."  <u>Republic of Nicaragua v. Standard Fruit Co.</u>,

3    937 F.2d 469, 478 (9th Cir. 1991).

4         In determining the existence of an agreement to arbitrate, the district court looks

5    to "general state-law principles of contract interpretation, while giving due regard to the

6    federal policy in favor of arbitration."  <u>Wagner v. Stratton Oakmont, Inc.</u>, 83 F.3d 1046,

7    1049 (9th Cir. 1996).  "[A]lthough 'courts may not invalidate arbitration agreements under

8    state laws applicable <u>only</u> to arbitration provisions,' general contract defenses such as

9    fraud, duress, or unconscionability, grounded in state contract law, may operate to

10   invalidate arbitration agreements."  <u>Circuit City Stores, Inc. v. Adams</u>, 279 F.3d 889, 892

11   (9th Cir. 2002) (quoting <u>Doctors Ass'n, Inc. v. Casarotto</u>, 517 U.S. 681, 687 (1996)

12   (emphasis in original)).  However, courts cannot apply even generally applicable

13   defenses to contract enforceability, such as unconscionability, in a way that disfavors

14   and undermines arbitration.  <u>AT&T Mobility LLC v. Concepcion</u>, 563 U.S. 333, 341–42

15   (2011).  Finally, "as a matter of federal law, any doubts concerning the scope of

16   arbitrable issues should be resolved in favor of arbitration, whether the problem at hand

17   is the construction of the contract language itself or an allegation of waiver, delay, or a

18   like defense to arbitrability."  <u>Moses H. Cone</u>, 460 U.S. at 24–25.  "An order to

19   arbitrate . . . should not be denied unless it may be said with positive assurance that the

20   arbitration clause is not susceptible of an interpretation that covers the asserted dispute."

21   <u>United Steelworkers of Am. v. Warrior & Gulf Navigation Co.</u>, 363 US. 574, 582–83

22   (1960).

23

24                                **ANALYSIS**

25

26         Defendants contend that Plaintiffs' claims are subject to a valid agreement

27   requiring resolution of their claims through binding arbitration and precluding Plaintiffs

28   from proceeding in a representative capacity.  Plaintiffs oppose Defendants' Motion on

                                        10

1   several grounds.  First, Plaintiffs contend that:  (1) the Contract "does not 'clearly and

2   unequivocally' reference or incorporate any document containing an arbitration clause";

3   (2) "Defendants cannot establish that [Plaintiffs] clearly and unequivocally consented to

4   the arbitration clause"; and (3) the arbitration clause was neither known to them or easily

5   available.  Pls.' Opp'n, ECF No. 15, at 7, 13, 14.[6]  Second, Plaintiffs argue that

6   Defendants waived their right to enforce the arbitration agreement in the first place.

7   Finally, Plaintiffs take the position that the arbitration agreement cannot be enforced as

8   to USBNA's parent, USB, because USB is not party to the Contract.  Each argument is

9   addressed in turn.

10          **A.      The parties entered into an enforceable arbitration agreement.**

11          The United States Supreme Court has explained that "the first task of a court

12   asked to compel arbitration of a dispute is to determine whether the parties agreed to

13   arbitrate that dispute."  Mitsubishi Motors v. Soler Chrysler–Plymouth, 473 U.S. 614, 626

14   (1985).  Whether an agreement to arbitrate exists is answered by applying state contract

15   law, even where the agreement is covered by the FAA.  Pokorny v. Quixtar, 601 F.3d

16   987, 994 (9th Cir. 2010).

17          Here, the first issue for the Court is whether the Rules containing the arbitration

18   clause were incorporated into the parties' Contract.  Under California law, "[f]or the terms

19   of another document to be incorporated into the document executed by the parties, the

20   reference must be clear and unequivocal, the reference must be called to the attention of

21   the other party and he must consent thereto, and the terms of the incorporated

22   document must be known or easily available to the contracting parties."  Shaw v.

23

24          [6] Plaintiffs do not argue that the arbitration agreement is unconscionable.  Plaintiffs do raise
     arguments, however, going to the font size and length of the various agreements, which the Court
25   addresses below.  Plaintiffs also do not explicitly contend that their claims fall outside the scope of the
     arbitration clause.  They do make a round-about argument that the class waiver provision can only apply
26   to claims that are required to be arbitrated and that some of their claims should thus be permitted to move
     forward on a class basis in this forum.  Pls.' Opp'n, ECF No. 15 at 17.  The Court disagrees, however, and
27   finds that all of Plaintiffs' claims, regardless of whether they are couched in tort or statutory terms as
     opposed to contractual terms, are covered by the provisions of the arbitration clause because they all
28   derive from a "dispute concerning [Plaintiffs'] account or [the Rules]."  Anderson Decl., ECF No. 10-1, ¶
     4(f), Ex. B, at 19–20

11

1    <u>Regents of Univ. of Cal.</u>, 58 Cal. App. 4th 44, 54 (1997) (citations omitted).  A defendant

2    is not required to specify that the incorporated document contains an arbitration clause

3    in order to make the incorporation valid.  <u>Wolschlager v. Fidelity Nat'l Title Ins. Co.</u>, 111

4    Cal. App. 4th 784, 791 (2003).  "All that is required is that the incorporation be clear and

5    unequivocal and that the plaintiff can easily locate the incorporated document."  <u>Id.</u>

6        In this case, the Contract specifically references the Rules and states that by

7    signing, signors agree to be bound by the terms of those Rules and confirm they

8    received a copy of them.  Anderson Decl., ECF No. 10-1, ¶ 5, Ex. C.  The Contract

9    explicitly incorporates the Rules by reference and makes clear that they are a separate

10   document that are being made part of the Contract itself.  <u>Id.</u>  Thus, the reference to the

11   Rules, which contained the arbitration clause, was "clear and unequivocal."

12       Further, the arbitration clause contained within the Rules was at the very least

13   "easily available" to Plaintiff.  According to Ms. Anderson, it is standard policy and

14   procedure for employees of Defendants to give the Rules to the customer when a safe

15   deposit box was rented, she always followed those procedures, and she thus followed

16   them with respect to the transactions with Plaintiffs.  Regardless of whether Plaintiffs

17   actually received the Rules or whether they read them, Plaintiffs could easily have

18   requested a copy.  That is sufficient here.  <u>See</u> <u>Botorff v. Amerco</u>, 2012 WL 6628952, at

19   *4 (E.D. Cal. Dec. 19, 2012) (relying on testimony as to a defendant's standard

20   procedures to support the conclusion that an arbitration agreement was readily

21   available).  Indeed, both federal courts and California state courts have enforced

22   incorporated arbitration agreements in circumstances similar to the facts of this case.

23   <u>See, e.g.</u>, <u>Reilly v. WM Fin. Servs., Inc.</u>, 95 F. App'x 851, 852–53 (9th Cir. 2004)

24   (affirming district court's ruling that arbitration agreement was enforceable even though

25   the plaintiffs never received or saw a copy of the incorporated arbitration agreement as

26   long as the arbitration agreement was easily available to the plaintiffs); <u>Lucas v. Hertz</u>

27   <u>Corp.</u>, 2012 WL 2367617, at *3 (N.D. Cal. June 21, 2012) (stating that the fact that the

28   plaintiff "either was never given a copy of the folder jacket or was given it after he signed

1    the rental agreement . . . is immaterial because the terms of an incorporated document

2    must only have been easily available to him; they need not have actually been

3    provided"); <u>Koffler Elec. Mech. Apparatus Repair, Inc. v. Wartsila N. Am., Inc.</u>, 2011 WL

4    1086035, at *4 (N.D. Cal. Mar. 24, 2011) (holding that, under California law, a document

5    containing an arbitration clause that was not provided to the plaintiff, but was available

6    upon request, was properly incorporated by reference into a purchase agreement);

7    <u>Wolschlager</u>, 111 Cal. App. 4th at 789–91 (explaining that the party's lack of awareness

8    of the arbitration clause does not prevent the clause's enforceability so long as the

9    document containing the arbitration clause was "easily available" to the party).

10          Therefore, the fact that Plaintiffs aver they were not provided with the Rules has

11   no bearing on the enforceability of the arbitration agreement contained therein so long

12   as the Rules were available to Plaintiff upon request.  <u>Botorff</u>, 2012 WL 6628952, at *5.

13   Plaintiffs have not provided any evidence to demonstrate that the Rules were not

14   available to them prior to signing the Contract.  The Court thus concludes that the

15   arbitration agreement contained in the Rules was validly incorporated by reference into

16   the Contract that Plaintiffs signed and thus is enforceable against Plaintiffs.[7]

17          **B.      Defendants did not waive their right to compel arbitration.**

18          Plaintiffs next contend that Defendants waived their right to rely on the arbitration

19   provision when they "directed [Plaintiffs] to seek relief in Court if they wanted to pursue

20   the matter."  Compl., ECF No. 1, ¶ 40.  "[T]he party asserting waiver must demonstrate:

21   (1) knowledge of an existing right to compel arbitration and (2) intentional acts

22   inconsistent with that existing right."  <u>Armstrong v. Michaels Stores, Inc.</u>, 59 F.4th 1011,

23   1015 (9th Cir. 2023).  There is no question here that Defendants knew they had an

24   existing right to compel arbitration.  The issue before the Court is thus whether

25   Defendants committed the requisite intentional acts:

26          _____

27          [7] Plaintiffs' arguments as to the font size or lack of clarity of the arbitration clause are not well
     taken.  The Court again notes that Plaintiffs have forgone bringing an unconscionability argument, so no
     such defense is before it.  In any event, the Court concludes that the documents were clear and

28   emphasized the material provisions by explicitly referencing the Rules and including the arbitration
     provisions in bolded font.

1
2
3
4
5
6
7
8

> Because there is no "concrete test," for assessing whether [a defendant] took acts inconsistent with its right to arbitration, "we consider the totality of the parties' actions." Hill [v. Xerox Bus. Servs.], 59 F.4th [457,] 471 [9th Cir. 2023)] (quoting Newirth [ex rel. Newirth v. Aegis Senior Cmtys., LLC], 931 F.3d [935,] 941 [(9th Cir. 2019)]). We ask whether those actions holistically "indicate a conscious decision . . . to seek judicial judgment on the merits of the arbitrable claims, which would be inconsistent with a right to arbitrate." Id. at 473 n.19 (quoting Martin v. Yasuda, 829 F.3d 1118, 1125 (9th Cir. 2016)). Under our precedent, a party generally "acts inconsistently with exercising the right to arbitrate when it (1) makes an intentional decision not to move to compel arbitration and (2) actively litigates the merits of a case for a prolonged period of time in order to take advantage of being in court." Newirth, 931 F.3d at 941.

9

Id.

10
11
12
13
14
15
16
17

The intentional act Plaintiffs contend is sufficient to waive Defendants' arbitral rights is the letter one of Defendants' employees sent to Plaintiffs after Defendants conducted an internal investigation of Plaintiffs' complaints. That letter included language directing Plaintiffs to seek a subpoena should they wish to request a copy of video surveillance of the drilling of their safe deposit box. According to Plaintiffs, this invitation to seek a court-ordered subpoena is enough of an intentional act inconsistent with Defendants' right to invoke arbitration for this Court to find Defendants waived that contractual right. The Court disagrees.

18
19
20
21
22
23
24
25
26
27
28

The Court cannot construe the statement of one employee to bind Defendants to a finding that it made "an intentional decision not to move to compel arbitration." Id. Indeed, this statement advised Plaintiffs only as to how they could procure a copy of a surveillance video, not how they might initiate legal proceedings on the merits of their substantive claims. Moreover, Defendants "did not actively litigate the merits of the case for a prolonged period to take advantage of being in court." Id. To the contrary, other than stipulations to extend Defendants' time to respond to the Complaint, Defendants' current Motion was their first filing with this Court. Defendants also made clear at the parties' Rule 26 conference that they would be pursuing the instant Motion. ECF No. 14 at 2. The Court concludes that Defendants "never [waffled] about whether to arbitrate or

1   stay in district court." Armstrong, 59 F.4th at 1016.  Plaintiffs' waiver argument is thus

2   unpersuasive.

3        **C.     The arbitration agreement is enforceable against all Defendants.**

4        Finally, Plaintiffs contend that the arbitration agreement should not be enforced as

5   to USB because it is not a signatory to the Contract.  Only USBNA is party to the

6   agreement.  However, "[c]ourts applying California law have routinely found that when

7   charges against a parent company and its subsidiary are based on the same facts and

8   are inherently inseparable, a court may refer those claims against the parent to

9   arbitration . . .  even if the parent is not formally a party to the arbitration agreement."

10  Marselian v. Wells Fargo and Co., 514 F. Supp. 3d 1166, 1172 (N.D. Cal. 2021) (internal

11  quotation marks and brackets omitted).  "As the Fifth Circuit aptly explained, '[i]f the

12  parent corporation was forced to try the case, the arbitration proceedings would be

13  rendered meaningless and the federal policy in favor of arbitration effectively thwarted.'"

14  Id. (quoting Sam Reisfeld & Son Import Co. v. S.A. Eteco, 530 F.2d 679, 681 (5th Cir.

15  1976)).  Accordingly, claims against both Defendants in this case are subject to

16  arbitration.

17       Plaintiffs' authorities are not to the contrary.  According to Plaintiffs, "a

18  nonsignatory may compel arbitration only when the claims against the nonsignatory are

19  founded in and inextricably bound up with the obligations imposed by the agreement

20  containing the arbitration clause."  Pls.' Opp'n at 18 (quoting Goldman v. KPMG, LLP,

21  173 Cal. App. 4th 209, 219 (2009)).  The problem with this argument is twofold.  First,

22  none of the cases Plaintiffs cite involve a parent/subsidiary relationship between the

23  signatory and non-signatory to an arbitration agreement.  Absent an agency relationship,

24  it makes sense that a non-signatory must show how the underlying contract containing

25  the arbitration clause is implicated in the first place.  Second, all of Plaintiffs' claims in

26  fact arise from the existence of an agreement to lease a safe deposit box.  Accordingly,

27  all of the claims against both Defendants are "founded in and inextricably bound up with

28  the obligations imposed by the agreement containing the arbitration clause" and thus are

1   arbitrable.

2

3                                  **CONCLUSION**

4

5          For the reasons set forth above, Defendants' Motion to Compel Arbitration and

6   Dismiss, or Alternatively, Stay Proceedings (ECF No. 10) is GRANTED.  This case is

7   hereby DISMISSED, and the Clerk of the Court is directed to close this case. The parties

8   will advise the Court of the status of setting arbitration within thirty (30) days that this

9   electronic order is filed.

10         IT IS SO ORDERED.

11

12  Dated:  August 16, 2023

13

14                                  MORRISON C. ENGLAND, JR.
                                    SENIOR UNITED STATES DISTRICT JUDGE
15

16

17

18

19

20

21

22

23

24

25

26

27

28